Clayeo C. Arnold, Esq., SBN 65070
ANTHONY J POIDMORE, SBN 51346
**CLAYEO C. ARNOLD
A PROFESSIONAL LAW CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 924-3100
Facsimile: (916) 924-1829
Email: APoidmore@justice4you.com

Attorney for Plaintiff ERIC REININGA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC REININGA,<br><br>    Plaintiffs,<br><br>vs.<br><br>TIMOTHY BELAVICH, JEFFREY BEARD AND GARY VIEGAS,<br><br>    Defendants. | Case No.:<br><br>COMPLAINT FOR DAMAGES<br><br><u>JURY TRIAL DEMANDED</u> |

COMES NOW Plaintiff, ERIC REININGA, and complains against Defendants, TIMOTHY BELAVICH (hereinafter "Belavich"), JEFFREY BEARD (hereinafter "Beard") and GARY VIEGAS (hereinafter "Veigas"), and alleges as follows:

1. Plaintiff brings this action based on the Constitution of the United States, the First Amendment and Federal Statutes including 42 USC section 1983 and this court has jurisdiction pursuant to 28 USC sections 1351, 1343 and 1367(a).

2. This action is properly filed in the United States District Court, Eastern District of California because Defendants reside within this Judicial District and Plaintiff's claim arose in this Judicial District.

3. Plaintiff, ERIC REININGA, PhD., is a licensed Psychologist and a resident of the Eastern District. He began work with the California Department of Corrections and

1

|   |   |
|---|---|
| | Rehabilitation (CDCR) in November of 2007 as a staff Psychologist at the California State Prison, Sacramento in Folsom. In approximately June of 2010 he was promoted to Senior Psychologist Specialist and transferred to the California Correctional Health Care Services (CCHCS) with the statewide Mental Health Program. |
| 4. | At all times herein relevant, Defendant Belavich was a resident of the Eastern District and was employed with CDCR as the Deputy Director, statewide Mental Health Program at CCHCS. As such, Belavich was Plaintiff's superior. In doing the acts herein alleged, Defendant Belavich was acting within the course and scope of his employment and agency. Plaintiff sues Belavich in his individual capacity. |
| 5. | At all times herein relevant, Defendant Jeffrey Beard, PhD., was the Secretary of CDCR and, as such, was Plaintiff's superior. In doing the acts herein alleged, Defendant Beard was acting within the course and scope of his employment and agency. Plaintiff sues Beard in his individual capacity. |
| 6. | At all times herein relevant, Defendant Viegas was a Special Agent with the Forensic Analysis and Support Team, at CDCR. In doing the acts herein, Defendant Viegas was acting within the course and scope of his employment and agency. Plaintiff sues Viegas in his individual capacity. |
| 7. | Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants was the agent, servant, co-conspirator and/or joint venturer of each of the remaining Defendants and acted within the course and scope of said relationship and pursuant to a common plan such that each Defendant authorized, negligently supervised and/or ratified each act of each of the other Defendants and were and are responsible for the acts against and damages to Plaintiff as herein alleged. |
| 8. | In his position with CCHCS, Plaintiff Reininga has done many suicide reviews, which were done to attempt to assure that the inmates had received appropriate mental health treatment and that the rescue (eg after an attempted suicide) was |

2

adequate.

9. A Federal Civil Rights lawsuit originally filed in 1990 under the Eighth and Fourteenth Amendments of the US Constitution and the Rehabilitation Act of 1973, commonly known as the Coleman Action (Coleman v. Brown, et al, 2:90-cv-0520 LKK VAD) alleged unconstitutional mental health care by the CDCR and, in June of 1994, a Magistrate Judge found that CDCR's delivery of mental health care to mentally ill inmates violated the Eighth Amendment to the US Constitution. The Coleman action is still pending in the United States District Court for the Eastern District of California.

10. In September 1995 the court issued a permanent injunction mandating certain forms of treatment for mentally ill inmates and ordered that a Special Master be appointed to monitor compliance with the court-ordered injunctive relief.

11. Plaintiff's duties over the years included working extensively on the Coleman compliance during which he read all of the institutions' mental health management reports produced periodically for the Coleman monitors.

12. In June 2010 Plaintiff was given the job of editing these reports before they were forwarded to the Coleman monitors and was supervised in this task not only by management psychologists but also a Deputy Attorney General, Debbie Vorous. Plaintiff was instructed to edit out anything that would look bad for the institution and, on the other hand, if the report was very good for a particular institution, he was told to temper the report so as to not set the benchmark too high for other institutions.

13. Plaintiff was told to develop a Coleman Mental Heath Management Report Template and, working with several experts at various CDCR institutions, he came up with a comprehensive Management Report. Deputy Attorney General Vorous then heavily edited it, removing much of the important material.

14. Over time Plaintiff came to the conclusion that CDCR considered itself to be in a perennial war with the Coleman monitors and that it had adopted a kind of siege

1. mentality, fighting strenuously to hold back as much information as possible rather than working collaboratively with the Court monitors to improve conditions.

15. Plaintiff noted that after the Psychologists completed their suicide review reports they were often put through a rigorous editing process by psychologists, attorneys, and medical and custody representatives and often found that their words and findings were changed, yet their names remained as the authors of the documents. Plaintiff, and to his observation other psychologists, were not always in agreement with the changes made to the reports.

16. On multiple occasions beginning in 1997, Joseph Damien Duran was in the custody of CDCR. Duran suffered from significant mental health problems including diagnoses of bipolar disorder, depression, psychotic disorder not otherwise specified (NOS) and anti-social personality disorder. He also suffered from hallucinations, including auditory hallucinations and on a number of occasions had been hospitalized in psychiatric inpatient hospitals.

17. Duran had a known history of suicide attempts and CDCR knew of Duran's previous diagnoses, psychiatric hospitalizations and suicidality.

18. In July 2007 Duran underwent a tracheal stenosis surgical procedure resulting in a trachestomy tube through which he breathed and which was an ongoing source of pain and discomfort.

19. On August 30, 2013 Duran again entered CDCR at the North Kern State Prison and underwent an initial psychiatric exam. Duran reported visual and auditory hallucinations and that he had thoughts of hurting himself.

20. On September 2, 2013 Duran handed a note to correctional staff indicating he is suicidal and on that date he was placed in a holding cell under suicide watch.

21. On September 4, 2013 Duran was sent to Mule Creek State Prison (MCSP) where he was assigned to a Mental Health Crisis Bed in a single-occupant cell because of the high chronic and acute risk of suicide he posed. The following day, September 5, he was placed on Suicide Prevention.

22. On September 6, 2013 Duran's Psychiatrist, Dr. Anand, noted that Duran was verbalizing paranoia and fear of correctional officers and that he had been up all night using the call light. Dr. Anand ordered Duran's suicide precautions be continued for the next 24 hours but, before that order even went into effect, Dr. Anand countermanded that order and instead placed Duran on purported "violence precautions" an ambiguous term for which no sanctioned policy or procedure existed within MCSP or CDCR.

23. Dr. Anand discontinued Duran's suicide precautions without adequately confirming that they were no longer required. Dr. Anand did not clinically examine Duran nor did she receive any report from medical, mental health or correctional staff suggesting that Duran's condition had in any way improved or changed before removing him from suicide precautions.

24. While Duran was under suicide precautions he was being checked every 15 minutes pursuant to protocol. However, once he was switched to non-existing "violence precautions" his welfare checks ceased.

25. On the evening medication round of September 6, the officers and LVN reached Duran's cell at about 8:30 pm and though he initially agreed to take the medications and placed his hands through the food port in order to be handcuffed ("cuffed up") he reportedly refused to voluntarily be cuffed up and leave his cell in order to attend his treatment meeting and refused to remove his hands from the food port.

26. Plaintiff is informed and believes, and thereon alleges, that the officers then, without any warning to Duran, emptied an oversized MK-9 can of OC Pepper Spray directly into Duran's face and neck with a significant amount entering his throat through the trachestomy tube. This caused Duran to immediately recoil backward and the food port was closed.

27. Inhalation of OC Pepper Spray creates an immediate known health risk in that it inflames the airways causing swelling and restriction and is extremely painful.

5

28. Plaintiff is informed and believes that Duran began to exhibit signs of physical distress and it was obvious that he was in need of immediate and emergent medical treatment. Nevertheless, contrary to applicable written CDCR rules regarding the use of OC Pepper Spray, neither of the officers nor the LVN, nor a sergeant who was present and witnessed the event, attempted to obtain medical assistance for Duran.

29. Plaintiff is informed and believes that immediately after Duran was pepper sprayed, staff observed Duran coughing up blood and attempting to alleviate pain in his stoma by removing the trachestomy tube (rinsing it in the toilet) and placing his finger in the stoma and rubbing the area.

30. Finally, about one and a half hours after Duran was sprayed, a nurse called the doctor of the day, Dr. Yu, to notify her of the situation and Dr. Yu ordered the nursing staff to have Duran evacuated from the cell, to remove his trachestomy tube, to clean the stoma site, to clean and re-insert the trachestomy tube and to monitor him for respiratory distress.

31. About two hours after Duran was pepper sprayed a nurse called Duran's treating psychiatrist, Dr. Anand, who also ordered that Duran be removed from his cell for decontamination. She further ordered that Duran be placed in a holding cell and administered Zyprexa, an anti-psychotic medication.

32. Correctional staff refused to comply with the orders given by Duran's doctors to evacuate him from the contaminated cell and to decontaminate and medicate him, instead relying on the arbitrary decision of the sergeant involved, who had no medical training, that Duran had sufficiently decontaminated himself such that custody staff should ignore the doctors' orders. This was done despite the fact that no member of the correctional staff attempted to speak to either physician about the orders.

33. Correctional and medical staff then observed Duran remove his trachestomy tube for a second time that evening and observed him to put his finger and foreign

objects (including reportedly spaghetti and feces) into his stoma as if to pack a wound.

34. Despite the additional observations, no one from correctional staff did anything to secure the necessary medical or psychiatric treatment. A nurse did, however, call Dr. Yu to inform her that the custody staff had refused to comply with the doctor's orders and that Duran was still in his cell and having obvious difficulty breathing. Dr. Yu responded "If the inmate is walking around, how can he be in distress?". Dr. Yu instructed the nurse not to call again unless it was important, and she was not contacted again regarding Duran until after his death.

35. During the next several hours, despite the fact that Duran was observed to be in pain and respiratory and other physical distress, all staff present continued to ignore his need for medical and psychiatric treatment.

36. At approximately 8:05 am on September 7, 2013, Duran was found unresponsive and not breathing on the floor in his cell and approximately one half hour later was pronounced dead.

37. Duran's death coincided with hearings being conducted in Federal Court in the Coleman case. A focus of the hearing was CDCR's use-of-force policy, including the improper use of pepper spray with mentally ill patients. Another was the department's inadequate policies in regard to suicide prevention for mentally ill patients.

38. Plaintiff is informed and believes that in order to avoid the potential impact on the Federal hearings in Coleman if the true facts of Duran's death became known before completion of those hearings, the Department utilized its Code of Silence and a cover up strategy of false, misleading and withheld information to keep the true facts from the Coleman monitors and ultimately, the Court.

39. Plaintiff is informed and believes that numerous CDCR correctional and medical persons, in order to avoid any implication of wrongdoing on their part or the Department's part in Duran's death, deliberately gave false information to the

Amador County Sheriff-Coroner, who was tasked with determining the cause of Duran's death.

40. Based largely on this misleading information, the Amador County Sheriff-Coroner's office determined the cause of death to be "Asphyxia" and classified the death as a suicide.

41. Plaintiff is informed and believes that subsequently the Death Review Committee at CDCR indicated the death was not a suicide but merely an accidental death.

42. Plaintiff became aware of information indicating that the Senior Psychologist Specialist assigned as a suicide reviewer in the Duran case was not allowed to talk with the personnel at MCSP but merely had to do a chart and paperwork review. Nevertheless that reviewer determined that Duran did not mean to kill himself and that the negligence of the MCSP staff was the proximate cause of death.

43. Plaintiff became aware that the Suicide Review Coordinator was also of the opinion that the death was the result of CDCR's extreme negligence and that the CDCR headquarter staff edited the reviewer's report and pressured the reviewer and coordinator to change portions of the suicide review to decrease the appearance of negligence on the part of CDCR in the incident.

44. The CDCR routinely provides documents regarding the death of Coleman class members to the Special Master and the class attorneys. On September 12, 2013 Deputy Attorney General Debbie Vorous sent an email to the Special Master concerning Duran's September 7, 2013 death and on September 16, 2013 Belavich sent a letter to the Special Master regarding the same death. Neither communication made reference to various unusual circumstances surrounding the death including that Duran was pepper sprayed in the face for refusing to surrender his food port, even though he had a trachestomy, and that custody refused repeated requests by clinical staff to open the cell and provide emergency medical and psychiatric treatment.

45. Moreover, the Program Guide in the Coleman case mandates that the final suicide

reports be provided to legally designated persons within 60 days of the death (in this case by November 6, 2013) and Plaintiff became aware that the Department was delaying the release of the report in an apparent attempt to avoid its use in the ongoing Coleman hearings. These evidentiary hearings concluded on December 19 and the Duran suicide report had still not been provided.

46. Plaintiff was aware that the conduct of CDCR was a matter of public concern, implicating the constitutional rights of prison inmates, their health and safety, and misconduct on the part of government officials.

47. Although it was not a part of Plaintiff's job duties to report such wrong doing, Plaintiff strongly felt that the public needed to be aware of the facts so that steps could be taken to remedy the situation and avoid future violations of constitutional rights, future unwarranted risks to the health and safety of inmates, and to avoid future wrongdoing on the part of government officials.

48. However, since it appeared to Plaintiff that nearly everyone in his chain of command, even the Attorney General's Office, was complicit, he believed there was no one to whom he could report who could be relied upon to bring the wrongdoing to light and to take steps to correct the problem.

49. Not wanting the information to remain a victim of the Code of Silence Plaintiff, in December of 2013, provided the original Duran Suicide Report dated October 31, 2013, and information regarding the cover up to a Sacramento Bee reporter in order to bring to light the wrong doing occurring at CDCR and thereby hopefully bring about beneficial change.

50. On January 7, 2014 CDCR finally provided the Coleman monitors and other designated persons the final Suicide Report which should have been provided on November 6, 2013. The cover sheet of this final Suicide Report was signed by both Directors Belavich and Michael Stainer.

51. The January 7, 2014 Suicide Report did not include specific findings regarding the custodial failings and the impact of the use of pepper-spray on the behavior and

ultimate death of Duran that were in the October 31, 2013 version of the Executive Suicide Summary Report provided to the Bee reporter. Among other things, the reports differed in the following respects:

    a.    The October 31, 2013 Version included a section entitled "Five Concerns Related to Custody". The January 7, 2014 version changed that section to read "Three Concerns Related to Custody."

    b.    The following was deleted from the January 7, 2014 version: "4. The inmate was pepper-sprayed when he would not release the food port. While an open food port is considered a security breach and pepper-spraying the inmate is permitted according to policy, it is recommended that the Warden's Use of Force Committee review this policy, especially as it relates to medically or psychiatrically ill inmates."

    c.    The following was deleted form the January 7, 2014 version: "5. Form 114-D, the Inmate Segregation Record, should have noted the third watch's interaction with the inmate holding the food port open, requiring the pepper spray. Additionally, first watch should have documented the interaction with the inmate about coming out of the cell to receive medical care as well as the injection of Zyprexa. Neither is on the record."

    d.    The following problem requiring a QIP was deleted form the January 7, 2014 version: "4. Form 114-D, the Inmate Segregation Record appeared to have been inaccurately completed as important interactions with the inmate, including actions the (sic) resulted in the discharge of chemical agents and his refusal to come out for medical care had not been documented. According to policy, all interactions with the inmate should have been documented.

52. On January 21, 2014 the Sacramento Bee published the first of a series of articles about the Duran death and the actions of the CDCR.

53. As a result of the new information brought forth by Plaintiff, the class attorneys

asked the Federal Judge to reopen the evidentiary hearing in the Coleman Use of Force Hearing.

54. The Federal Judge in the Coleman case ordered that the evidentiary hearing be reopened. As a result of the reopening of the evidentiary hearing and the additional evidence provided by the class attorneys, the Federal Judge declared, in April of 2014, that California's treatment of its mentally ill inmates was "horrific" and unconstitutional.

55. On the day the first Sacramento Bee article was published Dr. Belavich had Crime Scene Tape stretched out across the hallway leading to his office. Plaintiff is informed and believes that the Governor's office was on the phone and they were all circling the wagons trying to figure out how to put a more positive spin on the situation. The Department was incensed and vowed to uncover the source of this "leak".

56. The disclosures caused a great deal of embarrassment and unwanted scrutiny to CDCR and Plaintiff is informed and believes that CDCR then began a long and very expensive investigation in a determined effort to identify the source of the "leak".

57. In the course of the investigation, SA Viegas searched not only work computers but, without Plaintiff's knowledge or consent, obtained the records of Plaintiff's personal cell phone which was also used by his wife, Joyce Mitchell, who is a journalist, a four time Emmy Award winning documentary TV producer, and an HIV/AIDS activist with confidential communications and sources.

58. Many months after Plaintiff's initial disclosure, while the investigation was still ongoing, Plaintiff was informed in a casual conversation about the investigation with a high ranking CDCR official, that CDCR was still on the trail and was going to do whatever it takes to get the person who leaked the information.

59. On February 17, 2015, after investigating for approximately a year, SA Viegas and SA Dan Golla confronted Plaintiff in his cubical at work and instructed Plaintiff to report for an administrative inquiry the following day, February 18, at 9:00 am.

1 They also informed Plaintiff that the allegations were that he released, or had knowledge of who released, the information regarding the inmate deaths. Plaintiff was also instructed "not to discuss the details of this upcoming interview with anyone other than your chosen representative or retained legal counsel."

60. Plaintiff was naturally apprehensive about the possibility that this would ruin his career and that severe retribution would be taken against him for his whistleblowing activity and his breach of the Code of Silence.

61. On February 17, 2015, Plaintiff's wife contacted a local attorney, who was also a family friend, to represent Plaintiff and appear with him at the interview as well as preparing him for the interview. The attorney indicated that he had a court appearance in Auburn the following day but would contact SA Viegas and seek a short continuance of the interview so that they could prepare and he could accompany Plaintiff to the interview.

62. CDCR Operations Manual, Chap. 3, Art. 14, Section 31130.27 reads in pertinent part regarding use of state time for investigative matters: "Absent an emergency, employees may request and shall be allowed reasonable state time by the supervisor to contact/secure a representative to discuss the matter prior to any meeting/interview that may lead to adverse action. The employee shall also be allowed reasonable state time to prepare for the interview/meeting with the representative." The planned February 18 meeting had the potential to lead to an adverse action against Plaintiff.

63. That same day the attorney contacted SA Viegas, explained the circumstances, and requested a short continuance of the interview but, despite the fact that there was no emergency militating against a short continuance, Viegas denied the request and informed the attorney that Plaintiff would either show up the next day for the interview or be fired. Viegas denied Plaintiff his right to a short continuance in which to prepare with his attorney in order to retaliate against Plaintiff for speaking out about the wrongdoing of CDCR, to deprive Plaintiff of his

Constitutional right to freedom of speech protected by the First Amendment to the US Constitution, and to chill future speech by Plaintiff and others and convince them to adhere to CDCR's Code of Silence. Also, without proper preparation and representation, this would make it more likely that Plaintiff would say or do something at the interview that could constitute grounds for discipline.

64. On February 17 Plaintiff was also informed by the Union that it would be unable to consult with and accompany Plaintiff to the interview the next day and, therefore, Plaintiff enlisted a friend to accompany him the next day to the interview so that he could at least have a witness present.

65. That same day, February 17, 2015, knowing that Plaintiff had no representation for the following day's interview, Viegas in a further attempt to retaliate against and intimidate Plaintiff, phoned Plaintiff at least two times threatening that if he did not show up the next day he would be fired. Plaintiff asked several times whether Viegas could put off the interview so that his attorney could accompany him but Viegas stated words to the effect: "No, it's been decided. You must be there tomorrow. Be there or be fired." Plaintiff told Viegas that neither his chosen counsel nor the union representative could make it the following day but Viegas told him it didn't matter and that he wold be fired if he didn't attend regardless.

66. Later, at about 8:00 pm that evening, Plaintiff got word that a Union representative from the San Francisco area could accompany him and would meet him in the morning at the interview.

67. Plaintiff was unfamiliar with the Union representative, did not know how much to trust him and had little time to consult with him prior to the interview. Additionally, Plaintiff had never previously whistleblown and did not know what was proper or improper information to reveal regarding the facts of the whistleblow.

68. As a result of the above and of Plaintiff not having adequate time to consult with and prepare with an attorney, Plaintiff initially denied certain facts during the interview, including any knowledge of the whistleblow. The interview lasted five

13

to six hours and it was not until the near end of the interview that SA Viegas asked Plaintiff if he wanted an attorney present. By that time it was too late.

69. In a further effort to retaliate against Plaintiff for his speech and to chill future speech and violations of the Code of Silence, as well as to provide a further excuse for disciplining Plaintiff, SA Viegas intentionally mischaracterized and misrepresented certain conduct of Plaintiff, falsely accusing him of violating instructions not to discuss the details of the interview.

70. Defendants Belavich and Beard, in order to punish Plaintiff for his speech, to deprive him of his Constitutional Right to Free Speech protected by the First Amendment to the US Constitution, and to deter further speaking out and breach of the Code fo Silence, determined to terminate Plaintiff's CDCR employment.

71. This decision to terminate Plaintiff was made despite his prior good record and despite the fact that of all CDCR employees who engaged in serious misconduct and breach of policy in the events leading to and following Duran's death, including giving false information to government officials regarding the events leading to Duran's death, Plaintiff is informed and believes that he was the only CDCR employee who was terminated. Plaintiff is further informed and believes that the only other individual terminated in connection with Duran's death and its aftermath was another whistleblower that leaked information that the Suicide Review Coordinator had indicated that she received pressure to change the suicide report.

72. The actions of SA Viegas, Director Belavich and Secretary Beard in punishing Plaintiff for exercising his civil rights as guaranteed by the First Amendment to the US Constitution and attempting to chill future speech was malicious and done with a conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages according to proof.

73. As a direct and proximate result of Defendants Viegas, Belavich, and Beard's unlawful conduct as herein alleged, Plaintiff was caused to lose wages and

14

benefits in an amount according to proof. Plaintiff is informed and believes that he will continue to lose wages in the future in an amount as yet undetermined.

74. As a further direct and proximate result of Defendants Viegas, Belavich and Beard's conduct as herein alleged, Plaintiff was punished for and deprived of his constitutional right to free speech and was caused to suffer mental and emotional distress entitling him to damages in an as yet undetermined amount.

75. As a further result of the wrongful conduct of Viegas, Belavich and Beard, as herein alleged, Plaintiff was required to incur attorney's fees, expert's fees and costs for which he is entitled to reimbursement from Defendants.

WHEREFORE, Plaintiff prays for relief as follows:

1. For compensatory, general and special damages against each Defendant, jointly and severally, in the amount proven at trial.
2. For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.
3. For costs, expert costs and reasonable attorney's fees pursuant to 42 USC Sections 1983 and 1988 and as otherwise authorized by statute or law.
4. For prejudgement interest as allowed by law.
5. For such other and further relief as this court may deem just and proper.

Date: April 20, 2016  
CLAYEO C. ARNOLD  
A Professional Law Corporation

By: /s/Anthony J. Poidmore  
ANTHONY J POIDMORE  
Attorney for Plaintiff ERIC REININGA

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Date: April 20, 2016  By: /s/Anthony J. Poidmore