Clayeo C. Arnold, Esq., SBN 65070
Anthony J. Poidmore, SBN 51346
**CLAYEO C. ARNOLD**
**A PROFESSIONAL LAW CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 924-3100
Facsimile: (916) 924-1829
Email: apoidmore@justice4you.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC REININGA,<br><br>Plaintiffs,<br><br>vs.<br><br>TIMOTHY BELAVICH, JEFFREY BEARD AND GARY VIEGAS;<br><br>Defendants. | Case No.: 2:16-CV-0811-TLK-CKD<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANTS JEFFREY BEARD AND TIMOTHY BELAVICH'S MOTION TO DISMISS<br><br>Date: August 11, 2016<br>Time: 2:00 pm<br>Dept: 2 |

## I. INTRODUCTION

Plaintiff Eric Reininga is a licensed psychologist who worked for the California Department of Corrections and Rehabilitation (CDCR). Plaintiff leaked certain information to the Sacramento Bee regarding wrongdoing by CDCR and its employees. That leak was later investigated and it was determined that Eric Reininga was the source of the leak of the information to the Sacramento Bee. Defendants Belavich and Beard then terminated Plaintiff's employment with CDCR.

Plaintiff has brought an action under Section 1983 against certain employees of CDCR including Belavich and Beard, a Deputy Director and the Secretary of the CDCR respectively, claiming that Defendants violated his first amendment right to free speech. Specifically regarding Belavich and Beard, Plaintiff alleges that they, "in order to punish

Plaintiff for his speech, to deprive him of his constitutional right to free speech protected by the First Amendment to the US Constitution and to deter further speaking out in breach of the Code of Silence, determined to terminate Plaintiff's CDCR employment." (Complaint, Par 70) Defendants here bring a Motion to Dismiss under Federal Rule of Civil Procedure (FRCP) 12(b)(6).

## II. LEGAL STANDARD

Dismissal is appropriate under FRCP 12(b)(6) when a Plaintiff's allegations fail "to state a claim upon which relief can be granted." FRCP 12(b)(6) In evaluating the sufficiency of a complainant's allegations a court must assume the facts alleged in the complaint to be true unless the allegations are controverted by exhibits attached to the complaint, matter subject to judicial notice or documents necessarily relied on by the complainant's complaint and to whose authority no party questions. *Lee v. City of Los Angeles* 250 F.3d 668, 688-689 (9th Cir. 2001). A complaint attacked by a Rule 12(b)(6) Motion to Dismiss does not require detailed factual allegations. However, a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl Corp v. Twomby* 550 US 544, 555 (2007) A court should not grant dismissal unless the Plaintiff has failed to "plead enough facts to state a claim for relief that is plausible on its face." *Bell, supra.* Moreover, dismissal should be with leave to amend unless it is clear that amendment could not possibly cure the complaint's deficiencies. *Steckman v. Hart Brewing, Inc.* 143 F.3d 1293, 1296 (9th Cir. 1998) The Ninth Circuit has "repeatedly held that a District Court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possible be cured by the allegation of other facts." *Lopez v. Smith*, 203F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## III. PLAINTIFF HAD A FIRST AMENDMENT RIGHT TO DISCLOSE THE INFORMATION TO THE SACRAMENTO BEE

Courts evaluating claims by public employees who allege discharge in derogation

of their first amendment rights must engage in a two step inquiry. First, courts must determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." If so, courts must strike "a balance between the interests of the employee as a citizen, in commenting upon matters of public concern, and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board Educ.,* 391 US 563, 568; *Connick v. Meyers* 461 US 138, 146.

**A. Plaintiff Spoke As A Private Citizen On A Matter Of Public Concern**

Defendants do not dispute that Plaintiff spoke as a private citizen[1] but claim that the nature of his disclosure was not of public concern.

The *Pickering* court, Supra, 391 US at 573 acknowledged the public interest in having free and unhindered debate on matters of public importance declaring that such debate is "the core value of the Free Speech Clause of the First Amendment -". (Id.) The *Pickering* court further reiterated, at page 574, that " - - statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors."

Defendants' argument is based on a false premise, that is, that the information disclosed by Plaintiff was information protected by HIPAA. In this regard, Defendants argue that Plaintiff's disclosure was not a matter of public concern because, under HIPAA, an individual's protected health information is by its very definition a matter of private, not public, concern. Defendants cite no authority for this claim and the claim is manifestly inaccurate. The HIPAA regulations themselves list numerous exceptions to the rule of non-disclosure. As will be shown below, the information disclosed by Plaintiff was permissible

[1] Plaintiff's complaint at paragraphs 46 and 47 alleges that he was aware that the conduct of CDCR was a matter of public concern, implicating the constitutional rights of prison inmates, their health and safety, and misconduct on the part of government officials and, although it was not a part of his job duties to report such wrongdoings, he felt strongly that the public needed to be aware of the facts in order to remedy the situation. Thus it was not merely a matter of private interest or some banal workplace grievance, but a matter of public concern.

under HIPAA.

Defendants set up a straw man argument by citing one of the HIPAA exceptions,[2] implying that it is the only potentially applicable exception, then pointing out that the exception permits disclosure only to certain listed entities or individuals, none of which include a newspaper reporter such as the one to whom Plaintiff made his disclosure. This regulation has no applicability to the facts of our case. It shields a covered entity who also is an employer whose workforce member discloses protected health information under certain enumerated facts. Although Plaintiff, as a licensed psychologist, is a covered entity, he is not an employer and the disclosure here was not made by one of his "workforce members". This regulation, by its terms, would not protect Plaintiff regardless of to whom he made the disclosure.

Instead, the regulation permitting disclosure under the facts of this case is found at CFR 164.512(j)(1)(i) which provides: "A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, in good faith, believes the use or disclosure: (A) is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public and, (B) is to a person reasonably able to prevent or lessen the threat, - - -".

**1. Plaintiff in good faith believed the disclosure necessary to lessen a serious and imminent threat to the health or safety of the public**

Plaintiff's complaint alleges as follows: a federal civil rights lawsuit (the Coleman action) had been filed in 1990 under the 8th and 14th amendments to the US Constitution. In 1994 a Magistrate Judge found CDCR's delivery of mental health care to mentally ill inmates violated the 8th amendment to the US Constitution. The Coleman action is still pending. (Par. 9) The court issued a permanent injunction mandating certain forms of treatment for mentally ill inmates and ordered that a Special Master be appointed to

[2] 45 CFR §164.502(j)(1).

monitor compliance. (Par 10) Plaintiff, a licensed psychologist, worked extensively on Coleman compliance. (Par. 11) Over the years Plaintiff noted that CDCR developed a siege mentality with the monitors, seeking to hold back as much information as possible. (Par14) The Psychologists who authored suicide review reports often found their words and findings changed and were often in disagreement with the changes. (Par. 15) Joseph Damien Duran was an individual with multiple psychiatric disorders (Par. 16) who had undergone a tracheal stenosis surgical procedure resulting in a trachestomy tube. (Par. 17) On August 30, 2013 Duran was imprisoned at a CDCR facility (Par. 19) and three days later handed correctional staff a note indicating he was suicidal. (Par. 20) On the evening of September 6 Duran was pepper sprayed directly into his face with a significant amount entering through his trachestomy tube. (Par. 26) Duran began exhibiting signs of physical distress and was in obvious need of immediate and emergent medical care yet, contrary to written CDCR rules regarding the use of pepper spray, no CDCR employee attempted to obtain medical assistance for Duran. (Par. 28) Duran continued to deteriorate, continued to be ignored by CDCR personnel despite observations indicating an obvious need for care and the following morning, September 7, he was found dead in his cell. (Par. 29-36) Duran's death coincided with hearings being conducted in Federal Court in the Coleman case. A focus of the hearing was CDCR's Use-Of-Force Policy, including the improper use of pepper spray with mentally ill patients. Another was the Department's inadequate policies in regard to suicide prevention for mentally ill patients. (Par. 37) CDCR then used its Code of Silence in a cover up strategy of intentionally false, misleading and withheld information to keep the true facts from the Coleman monitors and the court, which was at that time conducting hearings in the Coleman case. (Par. 37, 38) Based on intentionally false information given by CDCR, the Amador County Sheriff- Coroner classified the death as a suicide. (Par. 39, 40) Plaintiff believed that CDCR's conduct "was a matter of public concern by implicating the constitutional rights of public inmates, their health and safety, and misconduct on the part of government officials." (Par. 46) Plaintiff believed that "the public needed to be aware of the facts so that steps could be taken to remedy the situation

and avoid future violations of constitutional rights, future unwarranted risks to the health and safety of inmates, and to prevent future wrongdoing on the part of government officials." (Par. 47)

Defendants do not even suggest that Plaintiff's belief that disclosure was necessary to prevent or lessen a serious and imminent threat to the health or safety of inmates was not made in good faith. Further, the court must assume the facts alleged in the complaint to be true unless controverted by exhibits attached to the complaint, matters subject to Judicial Notice or documents necessarily relied on by the complaint. (*Lee, supra,* 250 F.3d at 688-689.) The allegations therefore establish the first prong of the CFR 164.512(j)(1)(i) exception.

**2. The disclosure was to a person reasonably able to prevent or lessen the threat**

Plaintiff felt that, because "nearly everyone in his chain of command, even the Attorney General's Office, was complicit, he believed there was no one to whom he could report who could be relied upon to bring the wrongdoing to light and to take steps to correct the problem." (Par 46) Not wanting the information to remain a victim of the Code of Silence Plaintiff provided the information regarding the cover up to a Sacramento Bee Reporter "in order to bring to light the wrongdoing occurring at CDCR and thereby hopefully bring about beneficial change." (Par. 49) Thus Plaintiff's disclosure was permissible pursuant to CFR 164.512(j)(1)(i) if Plaintiff reasonably believed the Bee reporter was "a person reasonably able to prevent or lessen the threat.".

In the *Pickering* case, supra, Pickering, a teacher, was dismissed from his position by the Board of Education for sending a letter to a local newspaper in connection with a recently proposed tax increase that was critical of the way in which the Board and the District Superintendent of Schools had handled past proposals to raise new revenue for the school. The Board dismissed Pickering for writing and publishing the letter charging that the numerous false statements in the letter "would be disruptive of the faculty discipline, and would tend to foment 'controversy, conflict and dissension' among teachers,

administrators, the Board of Education, and the residents of the district." (Id at 567) The *Pickering* court held that Pickering's disclosure to the local newspaper was protected noting that you cannot improve any public body if you don't have freedom of information about what the public body is doing. The *Pickering* court emphasized the great importance of "the public interest in having free and unhindered debate on matters of public importance - the core value of the Free Speech Clause of the First Amendment - - -" (*Pickering, supra,* 391 US at 573.) Sunlight is the best disinfectant. Plaintiff was reasonable in believing that the Sacramento Bee reporter was "a person reasonably able to prevent or lessen the threat."

The Sacramento Bee reporter was a person reasonably able to "prevent or lessen the threat". The Bee had published numerous front page stories regarding the Coleman matter and was following it closely. A Sacramento Bee article published in the very venue in which the Coleman court was sitting would likely come to the attention of the court and the monitors. In fact, as a result of the new information brought forth, the federal Judge in the Coleman case ordered the evidentiary hearing to be reopened and additional evidence was provided by the class attorneys which led the Federal Court to declare in April 2014 that California's treatment of its mentally ill inmates was "horrific" and unconstitutional. (Par. 52-54) Thus steps were taken to lessen future improper medical treatment of inmates. The Bee article reasonably could, and in fact did, lessen the threat. Nothing in CFR 164.512(j)(1)(i) requires that the disclosure be to a public, rather than a private, organization or person.

It was also reasonable for Plaintiff to disclose the original Duran Suicide Report dated October 31, 2013 as that was necessary to accomplish the intended purpose of the disclosure. On January 7, 2014, CDCR finally (two months late) provided the Coleman monitors the "Final Suicide Report" (Par. 50). This is the report from which facts were omitted and changed. The January 7, 2014 report "did not include specific findings regarding the custodial failings and the impact of the use of pepper spray on the behavior and ultimate death of Duran that were reported in the October 31, 2013 version of the

report provided to the reporter. The January 7 report also omitted other highly relevant information implicating wrongful conduct on the part of CDCR employees. (Par. 51) Without disclosing the October 31, 2013 Duran Suicide Report for comparison with the January 7, 2014 report, the omissions, misrepresentations and wrongdoing would not have been apparent.

### B. The Interest Of Plaintiff Outweighs Defendant's Interest In This Case

Defendants' argument that the "Pickering balancing test" favors Defendants must fail inasmuch as their argument is entirely based on a false premise-i.e. that Plaintiff's disclosure of the health information of inmate Duran was "legally prohibited speech". As shown above, Plaintiff's speech was not only protected by the First Amendment, but was permissible under HIPAA.

Pursuant to Pickering, " The problem in any case is to arrive at a balance between the interests of the (employee), as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (391 US at 568.)

Defendants argue, based on their false premise, that the balance of interests favors Defendants because Reininga "had other, legitimate avenues for voicing his concerns without illegally leaking protected health information to the media while CDCR has a compelling, legally mandated interest in insuring that its employees comply with HIPAA and, thus, in investigating the unauthorized leak. Defendants conclude that CDCR has a compelling, legally-mandated interest in ensuring that its employees comply with HIPAA regulations safeguarding patient safety and that CDCR's interest in ensuring that its employees obey the law vastly outweighs Reininga's interest in disclosing the information. However, not only does CDCR have absolutely no interest in "safeguarding patient privacy" in instances, as here, where such disclosure is permissible, but they also mischaracterize Plaintiff's interest as merely one "in commenting on the circumstances of Duran's death

and CDCR's alleged 'cover-up'". Plaintiff had an interest far beyond that. His interest was that "the public needed to be aware of the facts so that steps could be taken to remedy the situation and avoid future violations of constitutional rights, future unwarranted risks to the health and safety of inmates, and to avoid future wrong doing on the part of government officials." (Complaint, Par 47). Although Defendants here argue that they terminated Plaintiff for his "illegal" disclosure and for lying in an investigation, the facts are that these Defendants terminated Plaintiff's CDCR employment "in order to punish Plaintiff for his speech, to deprive him of his Constitutional right to free speech protected by the First Amendment to the US Constitution, and to deter further speaking out and breach of the Code of Silence." (Complaint, Par 70.) Defendants failed to convincingly show that punishment of an employee for disclosing that CDCR imposes cruel and unusual punishment on inmate citizens, fails to take adequate steps to prevent inmate suicides and/or intentionally misleads the Federal Courts in order to shield Constitutional violations somehow "promotes the efficiency of the public services it performs through its employees." The Pickering balancing test clearly favors Plaintiff under these facts

Defendants, in their argument regarding the balancing of interests, note the absence of any Ninth Circuit authority discussing how the *Pickering* balance test applies in the context of "legally prohibited speech" and cite to three decisions from other federal courts which, Defendants argue, favor a finding for them on this issue. It should again be noted that, in this case, we are not dealing with "legally-prohibited speech". As shown above in section III, A, Plaintiff's speech and the information he disclosed was fully permissible within the HIPAA rules. Nevertheless, the three cases cited by Defendants[3], rather than favoring Defendants' position on this issue, favor Plaintiff's. The factual distinctions between the three cases cited by Defendants and this case highlights that the weighing of the *Pickering-Connick* factors would favor Plaintiff in the case at hand.

---

[3] The three cases cites are: *Magalis v. Adams* 879 F.Supp.2d 976 (C.D. Ill.); *Barnard v. Jackson County, Mo.*, 43 F.3d 1218 (1995); and *Jurgensen v. Fairfax County, Va.* 745 F.2d 868 (1984).

Interestingly, the Plaintiffs in each of the three cases cited by Defendants leaked confidential information, prohibited by law or rule, to a newspaper reporter and in each of the three cases the court found that the relative interests weighed in favor of the employer. Defendants first cite *Magalis v. Adams* 879 F. Supp.2d 976(C.D. Ill.) in which the Plaintiff state employee surreptitiously obtained an internal investigative report about another employee's unethical conduct and, fearing his agency was trying to cover up the employee's misconduct, leaked the report to the local newspaper and was fired.

The *Magalis* court noted that when conducting the balancing test, the court considers seven factors: "(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [his] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public" *Magalis*, 879 F.Supp at 989.

The *Magalis* case was decided on Summary Judgment and the evidence showed that Plaintiff's interest in making the report public was his belief that the co-employee's termination was not happening fast enough. Although the *Magalis* court found this was a matter of public concern it was not a matter of sufficiently strong public concern to outweigh the fact that the report disclosed the names of co-employees who had given information to the auditor in confidence. (*Magalis* at pg 990-991) Unlike the Plaintiff in *Magalis*, Reininga disclosed a matter of the utmost public concern- wrongdoing, misrepresentations, violations of constitutional rights, impairing the health and safety of mentally ill inmates and, in effect, misleading a court by a public entity.

*Magalis* argued that the factor regarding the time place and manner of the speech should be weighed in his favor because he "could not report his suspicions to the very people who were possibly engaging in the cover up." As indicated, however, *Magalis* was

decided on summary judgment and the court concluded that Plaintiff provided no evidence of a cover up. (*Magalis* at 991) In contrast, Plaintiff Reininga's allegations contained in paragraphs 48 and 49 of the complaint must be taken as true on this Motion to Dismiss.

Defendants also cite *Barnard v. Jackson County, Mo,* 43 F.3d 1218 (1995) in which Plaintiff, a legislative auditor, frequently discussed his conclusions with the press prior to providing his report to the legislature. Several legislators became aware and thus Plaintiff was instructed to defer discussions with third parties before the legislature was provided with the audit for personal review. Despite these instructions Plaintiff met with several members of the editorial staff of the newspaper to garner their support for the results and conclusions he reached in the report. The legislature became aware of the leak and terminated Plaintiff for these contacts. The court noted that when the legislators were contacted by the press and constituents concerning audits and investigations, the results of which they were unaware, they were prevented from communicating knowledgeably concerning the matters which had been leaked and this had the potential to erode citizen confidence in a competent and informed legislature. The court found this outweighed Plaintiff's interest in disclosing the material merely in order to garner support for his position. After first acknowledging that "allegations of corrupt practices by government officials are of the utmost public concern" (citation omitted) (Id at 1225), the court then noted that "insofar as self-interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight in the *Pickering* balance than speech on matters of public concern intended to serve the public interest." (Id at 1226) If Plaintiff's motives are less altruistic, the court will accord this expression less weight than if purely intended to serve the public's interest. (Id.)

Again, Plaintiff disclosed matter of the utmost public concern. Moreover, Plaintiff Reininga's motives were purely altruistic. He was not paid for the disclosure. He sought no glory or notoriety. If he had his way his identity as the discloser would never have been known by anyone other than his wife and the Bee reporter. As a citizen, the only personal benefit he could possibly have derived from the disclosure is the hope that it would prevent

his government institutions from engaging in serious constitutional violations of inmates' rights and endangerment of their health and safety. (Complaint Par. 47) A concomitant benefit to Plaintiff, as an employee, was the hope that he and his fellow employees would not be forced in the future to participate in attempts to thwart court-ordered oversight of the agency which had been designed to monitor the agency in order to assure that it not engage in cruel and unusual punishment and other violations of the inmates' rights and endangerment of their health and safety. Thus his expression should be accorded great weight in the balancing process.

Similarly in the *Jurgensen v. Fairfax County, Va*, 745 F.2d 868 (1984) case cited by Defendants, the inspection report released by plaintiff to the newspaper was found by the court to be "unquestionably a typical report, with a minimum of critical comment and a complete absence of a charge of corruption, abuse of process or power, waste or mismanagement." *Jurgensen, supra,* 745 F.2d at 872. It was thus of only slight public concern. Jurgensen was aware prior to releasing the report to the press that the Department had specifically refused to do so. The *Jurgensen* court noted that in weighing the factor relative to the impact such disclosure would have on the morale and efficiency of the agency, it is not necessary for the agency to prove that morale and efficiency in the agency have actually been adversely affected by the publications; it is sufficient that such damage to morale and efficiency is reasonably to be apprehended." (Id. at 879)

In considering the factor weighing the impact of the speech or activity on the efficiency, discipline and proper administration of the government agency, it can be argued in Reininga that morale and efficiency would reasonably be apprehended to be improved rather than harmed by the disclosure. Employees want to feel good about the job they are doing. Few employees would want to work for an employer which insists in their participation in illegal and unethical conduct. Moreover, proper administration of the agency requires that it not engage in the perpetration and cover up of serious violations of the constitutional rights of inmates, including the right to be free from cruel and unusual punishment.

A weighing of the *Pickering-Connick* factors is fact specific. Defendants Belavich and Beard, in their Motion, give no detailed discussion of the factors in light of the facts alleged in the complaint and why, under those facts, the balance favors them.

## IV. BELAVICH AND BEARD ARE NOT ENTITLED TO THE QUALIFIED IMMUNITY

Qualified immunity protects a state or local official who violated Plaintiff's federally protected rights so long as the official did not violate clearly established federal law. *Harlow v. Fitzgerald* 457 US 800 (1982).

In the Ninth Circuit, although the Plaintiff has the initial burden of establishing that the rights allegedly violated were clearly established, the Defendant asserting the right ultimately has the burden of proving the defense. (*Beningini v. City of Hemet* 879 F.2d 473, 479 (9th Cir. 1988); *Houghton v. South* 965 F.2d 1532 (9th Cir. 1992).)

A court required to rule upon qualified immunity of a government official must consider, as its initial inquiry, whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. *Saucier v. Katz* (2001) 533 US 194, 201. If the court determines that a favorable view of Plaintiff's alleged facts show that the official's conduct violated a constitutional right, a court's next step is to ask whether such right was clearly established. This inquiry must be undertaken in light of the specific context. (Id.) In determining whether a constitutional right is "clearly established", the relevant, dispositive inquiry is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Saucier, supra,* 533 US at 202.

"If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing the conduct. *Harlow, supra,* 457 US at 818. The *Harlow* court noted that qualified immunity would be defeated if an official "'*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], - - - .'" *Harlow, supra,* 457 US at 815. There need not be a case on all fours. If that were the rule, there would rarely be a first decision that could be cited as precedent. See *Deorle*

*v. Rutherford,* 272 F.3d 1272, 1286 (9th Cir. 2001) - Law was clearly established even though no precedent prohibited specific conduct at issue: “otherwise, officers would escape responsibility for the most egregious forms of misconduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct.” See also *Devereaux v. Abbey,* 263 F.3rd 1070 (9th Cir. 2001) (en banc) - Federal law can be clearly established, even when there is no precedent on point, when general constitutional principles give officials “fair warning” that their conduct is unconstitutional.

Defendants Belavich and Beard first concede, citing *Coszalter v. City of Salem,* 320 F.3d 968 (9th Cir. 2003) that abundant precedent stands for the broad proposition that government employees generally have a first amendment right to speak to the press about matters of public concern. Defendants then argue that precedents which hold that employees engage in protected speech when *legally* disclosing information would not give them notice that, in terminating Reininga in response to his “link of HIPAA-protected information and subsequent dishonesty” they was violating the first amendment. Plaintiff finds two difficulties with this argument. First, as indicated above, Plaintiff’s disclosure was not of “HIPAA protected information”. Secondly, Defendants’ argument assumes that Belavich and Beard’s motive in discharging Plaintiff is because of his “dishonesty”. That flies in the face of the facts in this case. In this case, Belavich and Beard terminated Plaintiff in order to punish him for his speech, in order to deprive him of his constitutional right to free speech, protected by the First Amendment of the US Constitution, and to deter further speaking out in breach of the Code of Silence. (Complaint, Par.70) These facts must be taken as true on this motion. The fact that Plaintiff was not actually terminated for dishonesty is further evidenced by the fact that, despite Plaintiff’s prior good record and despite the fact that of all CDCR employees who engaged in serious misconduct and breach of policy in the events leading to and following Duran’s death, including giving false information to government officials regarding the events leading to Duran’s death, Plaintiff was the only CDCR employee who was terminated. The only other individual terminated in connection with Duran’s death and its aftermath was another whistleblower

that leaked information that the suicide review coordinator had indicated that she received pressure to change the report. (Complaint, Par. 71)

Under qualified immunity, government officials are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights which they knew or reasonably should have known. *Harlow v. Fitzgerald*, 57 US 800, 818. Defendants Belavich and Beard are high ranking officials in the CDCR. Defendant Beard was Secretary of CDCR and Defendant Belavich was the Deputy Director of the state wide mental health program at CCH. These Defendants, who are admittedly partially responsible for enforcing HIPAA privacy rights, should "reasonably have known" that HIPAA contains exceptions under which disclosure is permissible. It is more likely that Plaintiff was simply terminated because the disclosures caused a great deal of embarrassment and unwanted scrutiny to CDCR. (Complaint, Par. 56) and that the Department was incensed regarding this "leak". (Complaint, Par. 55) As observed by Justice Thurgood Marshall in *Rankin v. McPherson* 483 US 378 at 384: "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employee's speech."

Thus there is no indication that Defendants should be entitled to qualified immunity.

## V. CONCLUSION

Should the court grant the motion to dismiss, Plaintiff requests leave to amend to state causes for violation of his first, fourteenth and fourth amendment rights.

Date: July 28, 2016

CLAYEO C. ARNOLD
A Professional Law Corporation

By: /s/ Anthony J. Poidmore
Anthony J. Poidmore
Attorney for Plaintiff